UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KAREN M. DYER, M.D., and
CALEB BERNARD OSBORNE HEPBURN,

Plaintiffs,

Case Number 03-10250-BC

v.                                                          Honorable David M. Lawson

COMMUNITY MEMORIAL HOSPITAL a/k/a
CHEBOYGAN MEMORIAL HOSPITAL,

Defendant.

_____/

**ORDER OVERRULING IN PART PLAINTIFFS' OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, OVERRULING
DEFENDANT'S OBJECTIONS, ADOPTING IN PART REPORT AND
RECOMMENDATION, GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, DISMISSING WITH PREJUDICE PLAINTIFFS' FEDERAL CLAIMS,
DISMISSING WITHOUT PREJUDICE PLAINTIFFS' STATE LAW CLAIMS, AND
DISMISSING MOTIONS _IN LIMINE_ AS MOOT**

Plaintiff Karen Dyer was employed for seven years as a pediatrician at Community Memorial

Hospital in Cheboygan, Michigan. She claims that during her tenure the defendant discriminated

against her because of her race and gender and the hospital's decision not to renew her employment

contract violated state and federal law because it was taken in retaliation for her complaints about

that discrimination. The plaintiff also alleges that later action by the hospital temporarily

suspending her staff privileges was illegal because it was retaliatory and motivated by discrimination

on account of her race and gender. She has brought her claims under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e-3, and various provisions of state law. The plaintiff's husband,

Caleb Bernard Osborne Hepburn, joins in the claims alleging loss of consortium. The defendant has

filed a motion for summary judgment as to all claims. The Court referred the motion to Magistrate

Judge Charles E. Binder pursuant to 28 U.S.C. § 636(b)(1)(B). On August 4, 2005, the magistrate

judge issued a report recommending that the Court grant the defendant's motion for summary judgment with respect to the plaintiff's federal claims and dismiss without prejudice the remaining state law claims. The parties have filed timely objections to the report and recommendation along with responses thereto, and the matter is before the Court for *de novo* review.

The Court now finds that the parties' objections lack merit and the magistrate judge's ultimate conclusions are correct.  Plaintiff Dyer has failed to come forward  with evidence, direct or circumstantial, from which a reasonable fact finder could conclude that she was discriminated against in the material terms and conditions of her employment under Title VII on the basis of her race and gender. Although the plaintiff has presented evidence that she engaged in protected activity, the first element of a Title VII retaliation claim, she otherwise has not demonstrated the defendant retaliated against her because of her race or gender.  The majority of defendant's objections are moot as a result of these conclusions.  The remaining objection, a request for attorneys fees, lacks merit: there has been no showing that the plaintiffs' claims were frivolous or undertaken in bad faith, and an award of attorneys fees is inappropriate.

The Court therefore will overrule the parties' respective objections, save for the plaintiff's challenge to the protected-activity element of her retaliation claim, adopt in part the magistrate judge's report and recommendation, grant the defendant's motion for summary judgment, dismiss the federal claims with prejudice, and dismiss without prejudice the plaintiffs' state law claims.

## I.

The facts and procedural history of the case are set forth in great detail in the magistrate judge's report.  Neither party takes issue with those portions of the report, although the plaintiff contests the conclusions drawn from the facts, which the Court will discuss below.  The Court finds

that the magistrate judge's recitation faithfully tracks the record as presented to him by the parties, and therefore the Court adopts it here.

II.

A.

The plaintiffs first object to what they characterize as the magistrate judge's failure to follow the familiar summary judgment standards. They claim that he ignored record evidence and took the defendant's explanation "hook, line and sinker." This objection, however, appears to an introductory statement meant to frame later, more specific objections. By itself, this contention is not supported by specific examples or citations to the record, and the Court, therefore, overrules it.

The Court is mindful that when adjudicating a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court views the evidence and "'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). However, once the moving party has made the "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the nonmoving party cannot rest on her pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex*, 477 U.S. at 324; *Hall v. Tollett*, 128 F.3d 418, 421-22 (6th Cir. 1997). The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). She must "do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  Applying this standard in its *de novo* review, the Court finds that the plaintiffs have not met their burden.

B.

Next, the plaintiff challenges the magistrate judge's conclusion that certain pay differentials did not constitute direct evidence of race and gender discrimination.  Specifically, she points to the fact that two younger, less-experienced, white pediatricians were offered more money as starting salaries than the plaintiff was earning at the time.  It is evident that the plaintiff feels strongly that she was treated unfairly.  However, this objection raises one narrow issue, not squarely addressed by her arguments: whether evidence that Dr. Darr initially was paid more, but ultimately the same wage as the plaintiff and Dr. Tryban was paid less than both the plaintiff and Dr. Darr is direct evidence of gender or race discrimination.  It plainly was not, and the plaintiffs' argument to the contrary suggests a fundamental misunderstanding of the requisites of "direct evidence" in employment discrimination cases.

The Court of Appeals for the Sixth Circuit  has explained many times that "[d]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005).  It does not require the fact finder to draw any inferences to reach that conclusion.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  For example, proof of "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to [avoid hiring] employees in the protected group is direct evidence of discriminatory

-4-

intent." *Ibid.*; *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed. Moreover, "the plaintiff attempting to establish a claim of [racial] discrimination using direct evidence must also point to an action or omission made with respect to the plaintiff's employment and connect the action to the discriminatory intent." *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 172 (6th Cir. 2004) (Gibbons J., concurring) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) (O'Connor J., concurring)).

Here, there can be little question that the pay differentials and the plaintiffs' rather lengthy recitation of workplace politics do not constitute *direct* evidence of discrimination. As the magistrate judge noted, the record reflects no instances of racial slurs or gender-based comments. The sixty-eight dollar pay differential, the fact that the plaintiff had experience above and beyond Dr. Darr, and Dr. Tryban's smaller salary prove discrimination only if one adopts the inferences the plaintiff advocates. For example, the pay difference between Darr and the plaintiff *could* suggest that the defendant favored white males over black females as pediatricians. It also *could* suggest that the defendant believed Dr. Darr had the potential to be a better doctor or had better credentials although less experience, or perhaps that the defendant was more desperate for doctors given market conditions. The record includes explanations that Darr hired an attorney to negotiate his contract (which the plaintiff did not do) and the plaintiff had other benefits Darr did not.

The plaintiff responds that the defendant should not be able to mask its discrimination by simply pointing to trivial differences such as these. As a matter of basic fairness, perhaps that logic may have allure. However, as a matter of law, the plaintiff's argument does not transform circumstantial evidence into direct evidence. The fact finder must still draw an inference to arrive

at the conclusion that differences in pay were motivated by racial- or gender-based animus. *See Rallins v. Ohio State University*, 191 F. Supp. 2d 920, 929 (S.D. Ohio 2002) (reasoning that a pay discrepancy by itself does not constitute direct evidence of gender discrimination because the fact finder must still draw a discriminatory inference).

Because none of the plaintiffs' cited evidence if believed, compels a conclusion that unlawful discrimination occurred, the evidence is not "direct," but only may serve as a component of a circumstantial case. The magistrate judge correctly concluded that there was no direct evidence of discrimination, and the Court therefore will overrule the plaintiff's second objection.

C.

The plaintiff next objects to the magistrate judge's determination that she failed to establish a circumstantial case of race or gender discrimination under Title VII. The magistrate judge reasoned that "Plaintiff has not claimed that she was terminated because of her race or gender. Instead, her claim is that she was deliberately discriminated against in material conditions of her employment on the basis of her race and gender[.]" Report & Recommendation (R&R) at 14 (internal citations omitted). Because she alleged race and gender discrimination in this manner, the magistrate judge found that the defendant had taken no adverse employment action against her. The plaintiff does not contend that the magistrate judge misread the theory of suit. Rather, she claims that the magistrate judge erroneously rejected the actions she cited as not sufficiently adverse.

To survive summary judgment in a Title VII case of race or gender discrimination, the plaintiff asserting a circumstantial case must come forward with evidence that (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was either replaced by a person outside of the protected class or that

-6-

similarly situated non-protected employees were treated more favorably.  *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  The Sixth Circuit has explained that not every action taken by an employer that potentially affects an employee rises to the level of an adverse employment action.  *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 796 (6th Cir. 2004).  A plaintiff must point to a "materially adverse change in the terms or conditions of her employment because of her employer's conduct." *Kosis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (internal citations and quotation marks omitted).

Examples of a materially adverse change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation."  *Ibid.*  At a minimum, however, "the change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Ibid.*  Here, the plaintiff states that the magistrate judge improperly relied on *Mitchell v. Vanderbilt University*, 389 F.3d 177 (6th Cir. 2004), in finding that the actions identified in this case were not sufficiently adverse.

In *Mitchell*, the plaintiff, a doctor, alleged that he was the victim of discrimination because his lab space was reduced, there were threats that his salary would be reduced, he was removed as a mentor of an academic program, attempts were made to force him into early retirement, and he was not appointed to research directorship.  The court of appeals held that these "actions either independently or collectively" failed to give rise to "a materially adverse employment action in the instant case." *Mitchell*, 389 F.3d at 182.  Most actions simply were  a "mere inconvenience or an alteration of job responsibilities" and not "enough to constitute an adverse employment action." *Ibid.* (quoting *Kocsis*, 97 F.3d at 886).  Further, the court found, "no evidence . . . suggest[ed] that these

-7-

actions significantly diminished [the plaintiff's] material responsibilities at Vanderbilt." *Ibid.* Here, the plaintiff does not challenge the magistrate judge's application of *Mitchell*. Rather, she asserts that the magistrate judge "ignores how out of step the *Mitchell* opinion is with a great quantity of 6th Circuit and other federal circuits' case law that examine situations where employees are subjected to the 'water torture' type of small and medium and then larger workplace difficulties designed to frustrate the employees' ability to work, and degrade them into submission or forced departure, rather than actually firing them or demoting them." Pl.'s Obj at 7 (citing *White*, 364 F.3d at 789; *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004); *Hollins v. Atlantic Co.*, 188 F.3d 652 (6th Cir. 1999)).

The cases that the plaintiff cites, however, do not offer support for her position. *White* involved a situation in which the plaintiff's pay was suspended for over a month and the plaintiff was transferred to a less prestigious job. 354 F.3d at 789. *Smith* involved a suspension and loss of pay for the equivalent of three work days. 378 F.3d at 575. Finally, the court in *Hollins* found that no adverse employment action had occurred where the plaintiff received low performance ratings (apparently without monetary consequence) after filing a discrimination complaint with the EEOC. 188 F.3d at 662. None of these cases suggests that *Mitchell* is bad law or even an outlier.

The plaintiff contends that the denial of a laptop computer was sufficiently adverse because there was evidence presented that a computer was needed to make her practice more efficient. She claims she was thwarted in her efforts to get one approved until after the white, male pediatrician simply was given a laptop. The plaintiff also states that productivity goals and monitoring were applied inconsistently to her as compared to the two younger doctors; the initial denial of full pay while she was on workers compensation leave for an injury was stressful, and she had to hire an

-8-

attorney to rectify the situation; the defendant suggested that she was not as productive as the younger pediatricians and was deserving of less pay; she was left out of important meetings and did not have input into the on-call schedule; she was rebuffed when she brought up complaints about and performance deficiencies of Dr. Darr; and she had to fight (successfully) a reprimand letter from going into her file about the handling of the workers compensation problem.

These actions are not materially adverse within the meaning of Sixth Circuit precedent in that the terms and conditions of the plaintiff's employment were not changed. The plaintiff was not demoted, her salary was not reduced, and her job title and responsibilities remained the same. The plaintiff's duties are not alleged to have changed in any manner during her employment. It is undisputed that the pay situation was rectified. That these events were stressful on the plaintiff does not mean that the terms of her employment were materially affected. Although the defendant apparently believed that the plaintiff was not productive and should be paid less, there is no indication that the defendant acted on that belief. The plaintiff does not allege that the events of which she complained prevented her from performing her job, although she does describe a feeling of unpleasantness in her working conditions, which apparently was mutually felt by others in her department. As the magistrate judge noted, "a bruised ego is simply not enough to constitute an adverse employment action." *Mitchell*, 389 F.3d at 189 (citations and internal quotation marks omitted). The Court therefore finds the plaintiff's third objection without merit.

D.

The plaintiff next takes issue with the magistrate judge's treatment of her retaliation claim. The essence of this claim is that the hospital did not renew her contract and later temporarily suspended her staff privileges in retaliation for her complaint to vice president of physicians services

John Bremer (later related by Bremer to hospital chief operating officer Michael Mihora) that she thought "she was being treated differently as a woman and black person by management, and that her white and male colleagues were not being discriminated against as she was." Pls.' Ans. Mot. Summ. J. at 21-22. She objects to the magistrate judge's reasoning that the plaintiff lacked a good faith belief in her opposition to what she believed was racial and gender discrimination, specifically "that her race, gender and possibly her status as a foreign national was the reason for her being denied fair employment conditions." *Ibid.* The plaintiff also challenges the magistrate judge's conclusions that the decision by the board not to renew her contract was not causally related to her opposition, and she did not come forward with evidence of pretext.

Title VII of the Civil Rights Act provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . ." 42 U.S.C. § 2000e-3. The Sixth Circuit has stated that the elements of a Title VII retaliation claim are that: (1) an employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) there is a causal link between the protected activity and the adverse employment action. *White*, 364 F.3d at 796 (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)). When there is no direct evidence of the "causal link," the plaintiff may establish a circumstantial case under the familiar burden-shifting method ordained in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). That approach was summarized recently as follows:

> To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity

and adverse employment action. . . .  If a plaintiff establishes a *prima facie* case of retaliation, the defendant may rebut the presumption of retaliation by asserting a legitimate, non-discriminatory reason for its actions. . . . The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for the employment action is pretextual. . . . The plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against her. . . . The plaintiff must submit evidence demonstrating that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action. . . . To inquire into the defendant's honest belief, the court looks to whether the employer can establish reasonable reliance on the particularized facts that were before the employer when the decision was made.

*Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005) (internal quotes and citations omitted).

The Sixth Circuit has acknowledged that establishing a *prima facie* case "is not onerous, but [a burden] easily met." *Nguyen*, 229 F.3d at 563; *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (holding that establishing a *prima facie* case entails a lower burden of proof than that which is required to support judgment on the merits).  However, if the plaintiff cannot produce facts supporting each element of the *prima facie* case, then the defendant is entitled to summary judgment. *Pierce*, 40F.3d at 801 n.7.

### 1.

A claim brought under the *opposition* clause of Title VII does not extend to all opposition activity.  *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986).  The Sixth Circuit has explained that courts must "balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel . . . .The requirements of the job and the tolerable limits of conduct in a particular setting must be explored." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989).  At the same time, "an employee is not protected when he violates legitimate rules and orders of his employer, disrupts the

-11-

employment environment, or interferes with the attainment of his employer's goals." *Ibid.*  Further,

the plaintiff must show that she had a good faith belief that the employment practiced she challenged

was unlawful. *Ibid.*

The magistrate judge concluded that, although the question was a close one, the plaintiff's

main complaint during the April 8, 2003 meeting was that she wanted to be treated better and not

that she was the victim of unlawful discrimination prohibited by Title VII.  He said:

> The undisputed evidence in this case, as Defendant CMH points out, is that Plaintiff
> Dyer's complaint at the time of the events at issue was that her education and
> experience were not being given the credence they deserved.  It is undisputed that
> as each event occurred – the discovery of Dr. Darr's base salary, the first laptop
> delivery, the decisions being made by the other pediatricians without Plaintiff's input
> – Plaintiff did not allege discrimination.  To be sure, she expressed her hurt feelings
> and her view that the two new younger and less-experienced doctors should be
> subordinate to her in every way. . . . Her employer, the hospital, however, did not
> agree.  From the hospital's point of view "[i]t makes no difference whether a
> pediatrician with 'impeccable credentials' with 6 years of experience with 2 years
> of neonatology training is treating an ear infection, or if a pediatrician fresh from
> residency is treating an ear infection.  The reimbursement rate is the same."
>
> I suggest that Plaintiff has failed to meet the first element of a prima facie
> case of retaliation because her allegation on April 8, 2003, was not based upon a
> reasonable good-faith belief that the hospital was engaging in unlawful
> discriminatory employment practices due to her race and gender. To the contrary, the
> evidence demonstrates that her allegation was based on (1) her belief that she was
> being treated unfairly in light of her education and experience and (2) her desire "to
> be treated better."

R&R at 34-35 (internal citations omitted).

The magistrate judge's conclusion appears to be based on a narrow view of the good faith,

reasonableness requirement.  Certainly, the plaintiff complained that she was being treated unfairly.

However, there is evidence that she specifically mentioned that she felt discriminated against

because of her gender or race.  *See* Def.'s Mot. Summ. J., Dyer dep. at 86 (testifying that during the

April 8, 2003 meeting "Mr. Bremer had expressed surprise that I would object to a less qualified,

-12-

American-born white male being paid – initially being offered initially more money than I was and then having that wage merrily made equal instead of any credence given to my apparent seniority . . . ."); *see also* Def.'s Mot. Summ. J., Coy dep. at 39 (stating that during the April 8, 2003 meeting "[I] recall that Karen made it clear she was unhappy about she had been treated, and . . . she stated she was – she thought she had been treated unfairly and been discriminated against because she was female, black, and foreign.  Excuse me, I don't recall that foreign ever came to issue at that point, but female and black did").

The magistrate judge reached his conclusion by relying on the Sixth Circuit's unpublished opinion in *Gomes v. Prime Design*, 85 Fed. Appx. 421 (6th Cir. 2003).  The court in that case found that the plaintiff mainly complained that she wanted to be treated better, stating:

> Plaintiff's argument that she suffered discrimination depends heavily on her own deposition testimony. . . . She testified that both her immediate supervisor, Mr. Fusco, and his boss, Mr. George, the company president, created a work environment that was hostile to her as a female. She said that Fusco would sometimes refer to a woman as a "dumb bimbo," and gave these examples of perceived sexual harassment: (1) George stood in front of her at her desk and said he was going to change clothes right there. She turned to face the wall and heard him unzip and rezip his pants and say, "I'm done." (2) George also stood in front of her without a shirt on, asked whether she was offended, pinched his nipples and said his "nipples were hard" and "cold." (3) Fusco, her supervisor, repeatedly used the word "fuck" as an expletive in front of her. (5) When asked to change a light bulb in the restroom, he offered her a flashlight and said, "What's the matter, don't you ow where your parts are?" While she later testified that she regarded these kinds of incidents as demeaning to women and as demonstrating hostility toward her as a woman, her main complaint at the time of the events had to do with the fact that she disliked being "yelled at" and was offended by what she described as the men's use of "profanity" in her presence. At one point, she advised George that she wished to be "treated as a lady."
>
>   In her letter to George of July 23, 1999, the plaintiff wrote that she "[did] not appreciate being spoken to with vulgar language and hostility" and "being screamed at." She specified that she "[did] not appreciate being spoken to with the 'F' word and hostility." She made no mention of any other conduct she found offensive. The company's response by letter the next day was to discharge her because "this office

-13-

> will not provide you with a workplace in which you are comfortable." Fusco and
> George regarded her sensitivity to these incidents as unreasonable and her
> complaints as hypercritical.

*Gomes*, 85 Fed. Appx. at 422-24. The present case is distinguishable, as the magistrate judge concedes. The plaintiff in this case did not write a letter. Instead, she presents deposition accounts of the meeting in which she brought up her belief of discrimination, a belief not clearly established in the letter written by the plaintiff in *Gomes*. Because there is no objective indication, such as a letter, of the grounds upon which the plaintiff voiced her opposition in this case, or negativing the claim that discrimination was discussed, the facts viewed in the light most favorable to the plaintiff support an argument that race and gender discrimination were part of the plaintiff's complaints voiced at the April 8, 2003 meeting.

This evidence established a material fact issue on the question of whether the plaintiff had a good-faith belief os discrimination. However, her belief also must have been reasonable, which suggests that there must be some objective evidence in the record to support it. *Booker*, 879 F.2d at 1312. Such evidence need not be as extensive as that which is necessary to establish a *prima facie* case in an employment discrimination claim. *Id.* at 1312-13. The record shows that the plaintiff was the only black, female pediatrician in this Northern Michigan hospital and her white colleagues, who were less experienced and credentialed, were paid more. That fact is sufficient to provoke an objectively reasonable belief in her mind that she was a victim of unlawful discrimination and legitimatize her complaint to hospital management for the purpose of establishing the first element of her *prima facie* case for retaliation. The Court, therefore, rejects the magistrate judge's contrary conclusion.

-14-

2.

As noted, a plaintiff alleging retaliation under Title VII also must come forward with evidence that creates a genuine issue of material fact of a causal connection between the retaliation (adverse action) and the opposition of unlawful discrimination. *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). In *Abbott v. Crown Motor Co., Inc*., 348 F.3d 537 (6th Cir. 2003), the Sixth Circuit articulated the causation requirement as follows:

> To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects. *See Nguyen*, 229 F.3d at 563; *Avery Dennison*, 104 F.3d at 861 (holding that a plaintiff need only present 'sufficient evidence to raise the inference that her protected activity was the likely reason for the adverse action' to establish the causation element).

*Id.* at 543. Temporal proximity alone generally is insufficient to create such an inference. *Hafford v. Seidner*, 183 F.3d 506, 516 (6th Cir. 1999). The magistrate judge concluded that the only other evidence of retaliatory animus that the plaintiff had proffered was the deposition testimony of Dr. Coy, which did not say what the plaintiff represented. *See* R&R at 36-37 (stating that "[t]he only evidence Plaintiff has directed the Court's attention to that might give rise to an inference of retaliatory animus that is '[e]ven Dr. Coy testified that he did not believe [CEO Michael] Mihora's explanation about Dyer's contract running out – as when she was fired she still had about 3 weeks left on her contract.' . . . I fail to find any testimony by Dr. Coy in this passage where he states he did not believe Mr. Mihora, as counsel has indicated)."

The plaintiff counters that Mihora's testimony that he was concerned about losing the two other pediatricians because they would not work with the plaintiff was not credible, based on the fact that only one day after meeting with the plaintiff on August 8, 2003, in which she voiced her

-15-

concerns of racial and gender discrimination, did Mihora advise the board to not renew Dyer's contract. In the plaintiff's mind, it would have made more business sense for Mihora to advise the board of the discrimination allegations and complete an internal investigation. Further, the plaintiff believes the wiser course of action for Mihora would have been to discuss the issues of discrimination with doctors Darr and Tryban instead of simply ending a long term relationship with a doctor of her caliber.

However, suggestions of how the defendant properly should have acted ignores the plaintiff's burden on summary judgment. A plaintiff must come forward with evidence from which a jury could infer a retaliatory motive and a causal connection. *Abbott*, 348 F.3d at 543. She may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Here, the plaintiff relies on the hope that a jury will disbelieve Mihora's stated reasons for recommending to the board that the plaintiff be discharged. As a matter of law, such a presentation is insufficient.

The plaintiff cites the deposition testimony of doctors Darr and Tryban for the proposition that they were locked into their contracts and could not leave even if they truly refused to work with her. *See* Def.'s Mot. Summ. J., Darr dep. at 21-22, 46-48; Tryban dep. at 30-34. The cited passages, however, cannot fairly be read as suggesting that either Darr or Tryban were locked into their contracts with the defendant. Both stated that they worked for a federal loan repayment program, the continued benefits of which were contingent upon practicing medicine in under served areas. Darr dep. at 22; Tryban dep. at 31. Those areas included more hospitals than just the defendant, as Darr explained:

-16-

> Q.      So does that mean you have to stay employed here throughout that period of time?
> A.      No.
> Q.      Okay.  What does it mean?
> A.      It means that I have to work in a health professional shortage area until that time.
> Q.      So if you left here, you have to go to another place that qualifies?
> A.      Correct.

Darr. dep at 22.

The plaintiff also states there was never any ultimatum: the two doctors never said they would leave if the plaintiff did not.  *See* Darr dep. at 141-43; Tryban dep. at 139.  The plaintiff is correct that no one ever threatened to quit because of her.  However, Darr testified that he complained to Dr. Yost about her.  The "gist of the conversation, I think, was that – that I could find Dr. Dyer at times, to be – that her reactions were difficult to predict, that she seemed to become angry at times that I didn't understand, and that I was having a hard time knowing how to respond to that, and did he have any ideas for me." Darr. dep. at 143.  Darr also recalled "expressing concerns about my interactions with Dr. Dyer to other physicians on a more friendly basis." *Id.* at 141.  According to the plaintiff, Dr. Tyban did "say that she felt the work environment had become too tense, and that she [may] have said something to Mr. Bremer about maybe looking to the Grand Rapid's area at some point . . . ." Pl.'s Obj. at 13.

The board never framed its decision to not renew the plaintiff's contract in terms of a threat by doctors Darr and Tryban to leave immediately because of the plaintiff.  Michael Konicki, chairperson of the defendant's board, explained:

> On April 9, 2003, I attended a meeting of the Board's Executive Committee.  CHM's Chief Executive Officer, Michael Mihora, also attends Executive Committee meetings.  Prior to this meeting, Mr. Mihora spoke to me and the other members about the upcoming April 30, 2003 expiration date of Dr. Dyer's employment contract with CMH.  Mr. Mihora recommended that CMH not renew Dr. Dyer's

-17-

contract.    Mr. Mihora stated that the two other pediatricians at CMH had considerable difficulty working with Dr. Dyer.  The Executive Committee's decision to accept Mr. Mihora's recommendation was not based in any respect on Dr. Dryer's race, gender, national origin or in retaliation for any allegations of discrimination. Rather, the Executive Committee decision to accept Mr. Mihora's recommendation was based on a concern over possibly losing two out of three pediatricians at CMH and the adverse effect that would have on the health car needs of the community.

Def.'s Mot. Summ J., Konicki decl. at ¶ 3.

The plaintiffs protest that a self-serving statement by the defendant's representative that no illegal discrimination animated the defendant's actions is insufficient to put the plaintiffs to their proofs at the summary judgment stage of the proceedings, and certainly that is true.  However, there is ample, actual evidence in the record to support the contention that the defendant entertained a legitimate concern that tension in the pediatrics department jeopardized the smooth operation of that part of the hospital and the cause was the plaintiff's prickly and volatile personality.  For instance, there is undisputed evidence that the plaintiff was difficult to work with.  Dr. Coy recalled "heated discussions amongst the pediatricians" and the plaintiff would sometimes "fly off the handle." Coy dep. at 54.  According to Coy, "flying off the handle, the most problematic for me, and also having been the chief of staff and understanding some of the issues, would be to get loud and talk about a case or an issue in the nursing work area or at the front desk, and there are patients within earshot." *Ibid.*  Apparently, it was "fairly common" that he "observed . . . flying-off-the-handle discussions in the office, where [he] overheard Dr. Dyer speaking in a raised voice[.]" *Ibid.*  John Bremer, vice president for physician services and the individual that held the plaintiff's contract renewal meeting, stated that he was aware of the "internal friction" between the pediatricians and the plaintiff was the cause of such friction.  Def.'s Mot. Summ. J., Bremer dep. at 92.  At one point, the plaintiff caused Tryban to break into tears:

-18-

> Dr. Dyer . . . came in and, you know, kind of walked to the nurse's station, and this is Dr. Tryban's case up until this point in time, grabbed the chart, and basically said this is not what I want, we're going to change all these things, and she started making changes in the care plan, and everything else. And it's one thing to sit down with your colleagues and say what did you do, what can I do, but it was just basically a walk in, grab it, leadership just changed and here's what we're going to [do]. And those kinds of things became very offensive, 'cause I watched Dr. Tryban break into tears over that issue and have to leave the room.

Bremer dep. at 95-96. Dr. Tryban testified that she was looking for a new job in February 2003 because of the plaintiff.

> Q.    And when you say that you were looking for a job in February of '03 because of – only because of Dr. Dyer, tell me why?
> A.    'Cause I realized, in the time period before that she was gone, like I had mentioned earlier, how different it was, how the practice environment was different, and how much more happy I was during that time, and I realized that, you know, looking at it long-term, that I did not want to stay in the previous environment.
> Q.    What efforts did you make to look for another job?
> A.    I was in Grand Rapids and had made some contacts with some – a mentor that was there at the time.

Tryban dep. at 101.

The record evidence establishes at least that the concern over the plaintiff's disruptive effect on her department's morale was not fictional on management's part. That concern certainly is a valid ground upon which an employer can base personnel choices. Of course, it does not establish the *absence* of a discriminatory motive by the defendant. But it is the plaintiff's burden to come forward with evidence beyond speculation and conjecture that creates a fact issue of causation that can be submitted to a jury. She has not pointed to any record evidence suggesting that her verbal complaint of racial and gender-based discrimination caused her contract to not be renewed. At best, the evidence indicates that she was difficult to work with and the defendant, correctly or incorrectly, decided to end the relationship in order to, in its view, placate and retain the other two pediatricians.

-19-

3.

The plaintiffs next take exception to the magistrate judge's finding that the suspension of plaintiff Dyer's medical privileges was not causally connected to her complaints of discrimination and filing a federal lawsuit.  The magistrate judge reasoned:

> [E]ven if Plaintiff had established the first element of a prima facie case of continued retaliation, I again suggest that Defendant would nevertheless be entitled to summary judgment on the grounds that [she] did not come forward with any evidence to create a material issue of fact showing a causal connection between her allegations of discrimination and the decision by the CMH Board . . . to uphold the suspension.
>
> Defendant has presented affidavits and/or deposition testimony from the CMH Board members where each trustee asserts that the decision to temporarily suspend Dyer's privileges was made based upon legitimate reasons unrelated to Dyer's race or gender or complaints.  Plaintiff has not attempted to refute these declarations, but instead argues that
>
> [t]his is a specious argument that has been rejected in Title VII law as being an inappropriate attempt to create a layer of bureaucratic insulate for corporate employers seeking to disavow actions of supervisors acting illegally.
>
> (Dkt. 52 at 63).  In support, Plaintiff cites two cases where an employee's supervisor tainted a committee's decision "by characterizing the plaintiff as a poor performer, thus making the committee a 'conduit' of his prejudice."  (*Id.*).  Plaintiff does not indicate, however, whom she believes tainted the decision of the CMH Board of Trustees in this case, let alone provide any explanation of how they did so.  Under Sixth Circuit precedent, the plaintiff "must offer evidence that the supervisor's racial animus was the cause of the termination or somehow influenced the ultimate decision maker.

R&R at 41-42.  The magistrate judge also noted that the plaintiff's suspension by Dr. Yost came after the plaintiff exchanged "harsh words" or "heated words" with the parents of a patient in the hospital.  It is undisputed, the magistrate judge explained, that the plaintiff reinitiated contact with the patients' parents the following day after Yost told her that a formal complaint had been lodged, she was no longer the patient's treating physician, and she was not to initiate contact with the family.

-20-

The plaintiffs do not point to evidence from which a causal connection can be inferred between the complaint of discrimination, either at the April 8, 2003 meeting or by her filing at the EEOC or this Court, and the suspension of medical staff privileges.  The plaintiff cannot even rely on the proximity in time, as she attempted to do in her argument relating to non-renewal of her contract.  However, she does argue that the hospital had no justification to suspend her, suggesting that the hospital's reason was pretextual.  The pretext argument does not arise unless the plaintiff makes out a *prima facie* case, which she has not.  Nonetheless, the Court will address that objection as well.

4.

In objecting to the magistrate judge's alternate finding that the plaintiffs failed to show the defendant's reasons for its adverse actions were pretexts for illegal discrimination for contract non-renewal, the plaintiff argues that the defendant did not follow its standard practice and such failure suggests a retaliatory motive.  According to the plaintiff, she presented evidence of three white doctors whose employment contracts had run out, but who continued to work absent a contract even in spite of disagreements with management.  She also claims that at least one board member could not recall an instance where a doctor who had worked for any length of time whose contract was set to expire was not permitted to stay on.

The plaintiff, however, fails to produce evidence that she was in the same position as these doctors.  The undisputed evidence shows that the plaintiff did not want to discuss renewing her contract at the meeting held for that purpose with Bremer.  *See* Bremer dep. at 123-25 (noting that "we chatted about incidentals" but "she looked at me and she said, there's nothing you can do.  And from this point forward all contract negotiations are going to be with my lawyer").  There is also no

-21-

evidence that the other doctors were causing the type of friction apparently engendered by the plaintiff. Mihora testified about the choice he felt he faced under the circumstances:

> I had gotten feedback from the other pediatricians that . . . the work environment in Women and Children's was very tense and stressful, and certainly not an enjoyable place to work, and at one point Dr. Tryban had indicated to me that it was making her ill and she was beginning to seek employment elsewhere, because she could not stand to work in that kind of environment, and the basic cause for that environment was that of Dr. Dyer. I took a lot of this input from the physicians, from the medical staff, as well as from . . . Mr. Bremer, into account, and also with the information that Dr. Dyer's contract was expiring the end of April of that year, which would have been 2003 . . . . Took that information together, and we had a board executive meeting . . . . and it was becoming very clear to me that either Dr. Dyer was going to remain in her current position and we would lose Tryban and Darr, or we could not renew Dr. Dyer's contract, and the likelihood of retaining Tryban and Darr would be much increased.

Mihora dep. at 80-81. The plaintiff dismisses this testimony as incredible. However, disregarding it does not advance the plaintiff's argument of disparate treatment to prop up her allegation of pretext. Simply because the plaintiff was treated differently than other white doctors in circumstances not shown to be alike does not give rise to an inference that the defendant retaliated against the plaintiff. The record is replete with testimony that the plaintiff was difficult to work with, and no evidence suggests the three doctors with whom the plaintiff seeks to compare herself faced similar problems.

The plaintiff also claims that the board improperly relied on Mihora's advice to not renew the plaintiff's contract. She states that "there is case law that supports the notion that when a corporate Board is given slanted and biased data from a key decision maker (here, Minora), they may honesty have not had the discriminatory animus in their hearts when they voted to adopt his recommendation, but the action is illegal retaliation because of the very source and bias of the messenger had tainted their judgment – here, Mr. Mihora." Pl.'s Obj. at 14. These contentions again

have no support in the record and apparently are made in the hope "that the trier of fact will disbelieve the movant's denial of a disputed fact[.]" *Street*, 886 F.2d at 1479.  Taken together, the plaintiff's arguments fail to suggest that the board's decision not to renew her contract was based on reasons that were a pretext for gender and race discrimination.

The magistrate judge also found that suspension of the plaintiff's staff privileges was upheld through all levels of the hospital's review procedure including the board of trustee, which had final decision-making authority.  In light of these facts, the magistrate judge concluded that the plaintiff failed to set forth evidence upon which "a reasonable juror could reject the given explanation for the suspension *and* infer that CMH discriminated against her on the basis of her race and gender." R&R at 43 (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).

> Plaintiff . . . claims that her conduct was insufficient to warrant the temporary suspension of her privileges, asserting that "white males with such alleged disruptive behaviors are/were treated far differently and less harshly than plaintiff." Plaintiff identifies Drs.  Kiel, Baltzer, Yost, Darr and Jackson as the white males who were treated less harshly after they engaged in "disruptive behavior." To demonstrate pretext by this method, Plaintiff must present evidence that a similarly situated employee who was not in the protected class and who engaged in conduct substantially similar to that of Plaintiff was treated less harshly.  "[T]o be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear & Tire Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)
> . . .
> Plaintiff has not alleged, let alone presented evidence to support, that any of the asserted comparable physicians engaged in similar disruptive behavior while Dr. Hal Yost was the chief of staff and the hospital's board consisted of the same directors.

R&R at 44.

In her objections, the plaintiff does not supply the information that the magistrate judge found lacking.  Rather, she repeats the argument that her encounter with a patient's parents in the

-23-

manner described above was insufficient as a matter of law to warrant suspension of hospital privileges, and therefore pretextual. The plaintiff relies on *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2000).

That case, however, does not advance the plaintiff's position. The court of appeals there did not lessen the traditional summary judgment burden in a Title VII case. It simply reiterated the three methods of showing pretext, one of which includes demonstrating that a certain type of malfeasance normally does not warrant such a harsh response. *Id.* at 564 ( stating "[a] plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct") (citations omitted); *see also Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Therefore, as the magistrate judge noted, the plaintiff "does not indicate, however, whom she believes tainted the decision of the CMH Board of Trustees in this case, let alone provide any explanation of how they did so." R&R at 42. Stated otherwise, the plaintiff has offered a legal conclusion, not evidence of pretext.

Moreover, instead of providing evidence that certain doctors were comparable to her, the plaintiff argues that the magistrate judge was "overly slavish" in his application of the similarly-situated requirement. She quotes a portion of this Court's decision in *Serrin-Brandel v. Pier 1 Imports, Inc.*, 2004 WL 1212205 at *12 (E.D. Mich. May 19, 2004), in support:

> [A]s the Sixth Circuit first explained in *Mitchell v. Toledo Hosp*., 964 F.2d 577, 585 (6th Cir. 1992), "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated in all respects." *Mitchell*, 964 F.2d at 583. That standard was softened somewhat in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), where the court stated that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the

-24-

> plaintiff and the employee with whom the plaintiff seeks to compare himself or
> herself must be similar in 'all of the relevant aspects.'" *Id.* at 352 (citation omitted).
> In *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000), the Sixth Circuit explained that
> it "has asserted that in applying the standard courts should not demand exact
> correlation, but should instead seek relevant similarity." *Id.* at 601

However, the plaintiff fails to note that this Court was explaining the same standard upon which the

magistrate judge relied in this case, namely the one set forth in *Ercegovich*. Similarity in all relevant

aspects, the *Ercegovich* court explained, generally means that discipline can be viewed as uneven

only when the plaintiff and the comparitor employee have the same supervisor, among other

considerations:

> We held that to be deemed "similarly-situated" in the disciplinary context, "the
> individuals with whom the plaintiff seeks to compare his/her treatment must have
> dealt with the same supervisor, have been subject to the same standards and have
> engaged in the same conduct without such differentiating or mitigating
> circumstances that would distinguish their conduct or the employer's treatment of
> them for it." *Mitchell*, 964 F.2d at 583. These factors generally are all relevant
> considerations in cases alleging differential disciplinary action.

*Ercegovich*, 154 F.3d at 352. It is undisputed that the other doctors disciplined less harshly, to

whom the plaintiff seeks to compare herself, did not have the same supervisor or upper-level review

board. The plaintiff cites general unfairness and difficulties in proving her case as the reasons why

these considerations are irrelevant. The Court is mindful of the challenges the plaintiff faces in

proving a discrimination and retaliation claim under Title VII. However, such challenges are present

in many cases and do not serve, alone, to render irrelevant the levels of proof laid down by

established precedent.

Even if the same supervisor and board were not relevant considerations in this case, the

plaintiff has failed to provide evidence on other key measures of comparability, such as whether

other doctors engaged in disruptive conduct similar to the plaintiff's. For example, the plaintiff does

not show that the other doctors who were not suspended had confrontations with patients or their parents. Ultimately, the plaintiff challenges the legal conclusions upon which the magistrate judge based his determination that the plaintiff's opposition to what she believed was discrimination was not the cause of the suspension of her hospital privileges and that the plaintiff failed to come forward with evidence that the defendant's reason for suspending the privileges – an unpleasant confrontation with a patient's parents – was a pretext for retaliation. The magistrate judge correctly cited and accurately applied the law of this Circuit with respect to causation and pretext, and the Court, therefore, overrules the plaintiff's fifth objection.

E.

The plaintiff's final two objections concern the magistrate judge's recommendation that the Court dismiss her state law claims. To be sure, the Court has supplemental jurisdiction over the those claims because they form part of the same controversy as the plaintiff's federal discrimination and retaliation claims. *See* 28 U.S.C. § 1367(a). However, section 1367 also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over the state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002); *Weeks v. Portage County Executive Offices,* 235 F.3d 275, 279 (6th Cir. 2000) (observing that section 1367(c) "permit[s] the

-26-

district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction"). As a general rule, the dismissal of claims over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Blakely*, 276 F.3d at 863.

The Court agrees with the magistrate judge and finds that it is appropriate to decline the exercise of supplemental jurisdiction over the state law claims in light of non-viability of the plaintiff's federal claims. Those claims, therefore, will be dismissed without prejudice.

### F.

Finally, the defendant also lodges objections to the magistrate judge's report and recommendation. In addition to commenting on the merits of its motion for summary judgment, the defendant also asks the Court to find that "CMH has met the standards set forth under 42 U.S.C. § 11112(a) and 42 U.S.C. § 11113, and that CMH is entitled to attorneys' fees pursuant to § 11113 and § 11112(a) because it has substantially prevailed. Def.'s Obj. at 2. The majority of the defendant's merits objections are moot in light of the Court's previous conclusions and need not be addressed.

The defendant seeks attorneys fees as a substantially prevailing party under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e5, and the Health Care Quality Improvement Act, 42 U.S.C. § 11113. As a threshold matter, both statutes require a showing the plaintiffs' claims were "frivolous, unreasonable, without foundation, or [undertaken] in bad faith." 42 U.S.C. § 11113; *Jeung v. McKrow*, 264 F. Supp. 2d 557, 576 (E.D. Mich. 2003) (noting that under the HCQI, an argument is frivolous "if it lacks an arguable basis either in law or fact.") *accord* 42 U.S.C. § 2000e5-(k); *Balmer*, 423 F.3d at 615 (stating that "[t]he employer may be awarded attorneys' fees where the

plaintiff's claim was frivolous, unreasonable, or without foundation, or where the plaintiff continued to litigate after it became clear that her claim was frivolous, unreasonable, or without foundation"). Although the plaintiffs did not prevail on their federal claims, there is no showing on the record that the plaintiffs brought the lawsuit in bad faith or the claims asserted otherwise were frivolous. *Balmer*, 423 F.3d at 616 (reasoning that "[c]ourts should not conclude that a claim was groundless just because it was ultimately unsuccessful"). The Court therefore overrules the defendant's objections.

III.

After conducting a *de novo* review of the record in light of the parties' objections, the Court is satisfied that the defendant's motion for summary judgment should be granted. The magistrate judge correctly applied the law with one, non-material exception, and the plaintiffs' objections otherwise lack merit.

Accordingly, it is **ORDERED** that the plaintiffs' objections to the magistrate judge's report and recommendation are **OVERRULED IN PART.**

It is further **ORDERED** that the defendant's objections to the magistrate judge's report and recommendation are **OVERRULED**.

It is further **ORDERED** that the magistrate judge's report and recommendation is **ADOPTED IN PART**.

It is further **ORDERED** that defendant's motion for summary judgment [dkt # 35] is **GRANTED** and the plaintiffs' claims based on federal law are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**.

-28-

It is further **ORDERED** that the motions *in limine* filed by the parties [dkt #s 48, 51, 86, 87]

are **DISMISSED** as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 21, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 21, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS